# Southern Billiard & Supply Company v. Shepherd.

(Decided January 21, 1930.)

WILSON & WILSON for appellant.

F. J. EVERSOLE for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

The Southern Billiard & Supply Company is a partnership composed of R. Russell Burnett and J. W. Burnett, and is engaged in business at Roanoke, Va. D. R. Shepherd was the proprietor of a pool room at Hazard. On April 19, 1922, Shepherd ordered in writing from the Southern Billiard & Supply Company 13 billiard and pool tables, with complete equipment. The purchase price was $4,290. In the trade, Shepherd was given credit for $900 for some old tables, and agreed to pay $250 in cash and to pay the balance in monthly installments, evidenced by 24 notes, 1 for $150, and 23 for $130. The order was subject to acceptance by the seller. According to the order, the pool tables were to be equipped with Goodrich cushions. On the day the order was signed,

the salesman wired the Wendt Billiard Manufacturing Company, of Milwaukee, Wis., to rush the pool room equipment, consisting of "Goodrich extra fast cushions." The seller had the equipment shipped by freight, with bill of lading or draft attached, and it was necessary for Shepherd to execute the installment notes and mortgage and pay the cash payment of $250 before he could get possession of the equipment. The equipment arrived in Hazard on or before May 23, 1922. The notes were executed on May 23, and on June 1 Shepherd executed a mortgage to secure the payment of the notes. The description of the property in the mortgage was the same as the description in the original order. On the execution of these papers the equipment was taken from the freight office and installed in Shepherd's place of business.

On November 20, Shepherd wrote the seller, complaining that some of the rails were without some of the required holes, and that the rubber cushions on the tables were not satisfactory. At this time he was in arrears in his payments, and notified the seller that, unless some other cushions were put on the tables, he would not pay any more notes. In order to satisfy Shepherd, the seller agreed to replace the rubber cushions with a different and higher grade of cushion without charge to Shepherd. Shepherd consented to the arrangement and the plan was carried out. Thereafter Shepherd wrote the seller that the new cushions were in use and giving good satisfaction. Shepherd then commenced to pay his notes, and paid all of them except five. In June, 1923, he wrote the seller that his business was bad and that he was hard pressed, and asked for leniency. On November 5, 1924, the partnership brought suit to recover on the notes and enforce the mortgage lien. Shepherd filed an amended answer and counterclaim, in which he pleaded that the seller's agent represented that he would ship and sell to him 13 sets of Brunswick cushions, instead of Goodrich cushions; that the cushions shipped to him were of inferior quality and could not be used, and that he was compelled to expend the sum of $250 to put them in condition for use; that the Brunswick cushions which he bought were worth at least $425, whereas the Goodrich cushions that were shipped to him were worth only $150; and that he was entitled to recover the difference in price, amounting to $275, and also the sum of $250, which he

was forced to expend on the tables. In another paragraph he pleaded that plaintiff agreed to ship and deliver the equipment with Brunswick cushions within three weeks from and after May 3, 1922; that he failed to do so until the 23rd day of July, 1922; that during that time he was compelled to pay rent at the price of $300 per month, and would have made a profit of $800, if plaintiff had shipped the tables and supplies within the time agreed upon. On this account he sought damages in the sum of $1,250, making a total damage of $1,775, for which he asked judgment on his counterclaim. On final hearing the court dismissed the petition, and awarded Shepherd judgment over against plaintiff in the sum of $675. Plaintiff appeals.

Briefly stated Shepherd's evidence on direct examination is as follows: He made the purchase through appellant's agent. The agent agreed to furnish Brunswick cushions and to have the equipment in Hazard in three weeks. When the tables came they were Goodrich cushions. After waiting several weeks he canceled the order. In a few days the tables arrived. He had no chance to get the tables until after the notes were signed. After the tables were put up he found the cushions were dead. After running the tables for a few weeks, his trade left him, and he was thereby damaged in the sum of $1,000. It was two or three months from the time he should have received the tables until he finally got them, and he was paying $500 per month rent. The Brunswick cushions were worth $275 more than the ones shipped. He then notified appellant, and it agreed to put on the Master Fast cushions. After that he sent to Louisville, and had the Stapletons come up and change the cushions, which cost him something like $100. He would not have purchased the equipment, unless the agent had led him to believe he was going to ship Brunswick cushions. He learned that the cushions were Goodrich cushions, after the tables were put up and they began to play on them. His trade left him on account of the dead cushions. He then wrote appellant. After the new cushions were received, they were set up and the balls would jump off the table. He then had them reset, and they did very well. When he signed the mortgage notes, he had an agreement with the salesman that he would get the Brunswick cushions. On cross-examination he testified that he knew the difference between cushions and how to place them. Appellant made him a proposition that, if

he were dissatisfied with the cushions and would ship and dismantle them and send them back, it would replace them with Master Fast cushions. After that appellant did replace the cushions with Master Fast cushions. After these rails came back, he did not know who put the rails on, "but some of us did." After that he noticed the balls jumping off the table. He did not notify appellant about this, but sent for Stapleton's man, and paid him $100, or about that, to reset the rails. He did not know how he paid Stapleton. The tables originally arrived in Hazard before he signed up the notes. He left his original location, and went to the Combs Hotel before or at the time the tables came. The record further discloses that, after Shepherd made complaint that the cushions were dead, appellant proposed to settle the matter by substituting Master Fast cushions for the cushions first sent. This proposition was accepted and the Master Fast cushions delivered.

Though Shepherd attempted to plead that the notes and mortgage were obtained by fraud, he never pleaded that the original contract was obtained by fraud, nor did he ask a reformation of the contract on the ground of mistake on his part and fraud on the part of appellant. On the contrary, he merely pleaded that appellant's agent represented that he would send him Brunswick cushions and testified to the same effect. As the written contract called for Goodrich cushions, parol evidence was not admissible under the pleading to vary the terms of the contract, and show that he contracted for Brunswick cushions. Turner Elkhorn Coal Co. v. Smith, 218 Ky. 503, 291 S. W. 715; Goldstein v. McDonald, 223 Ky. 161, 3 S. W. (2d) 200. Not only so, but it is hardly probable that appellant agreed to furnish cushions manufactured by its chief rival in business. This of itself is sufficient to dispose of appellee's claim for damages based on appellant's failure to furnish Brunswick cushions. But the case for appellant is made all the stronger by subsequent developments. When appellee complained that the cushions were dead, appellant proposed to settle the matter by furnishing a better grade of cushions. Appellee accepted the proposition, and the new cushions, which appellee declared to be satisfactory, were delivered. Having settled the controversy on this basis, and having made several payments based on that settlement, without further complaint of the kind or quality of the substituted cushions, he is now estopped to claim damages

on the ground that he was not furnished Brunswick cushions, or that the cushions actually furnished were not as live as they should have been.

Nor is he entitled to recover the $100.00 which he claims to have spent for the purpose of having the cushions reset  He admits that the substituted rails were put on by some one connected with his establishment. Hence, if the rails were improperly set, the fault was his, and not appellant's, and appellant cannot be held liable for any damages due to his negligence.  Equally unsubstantial is the claim for rent during the alleged delay in delivering the equipment.  It hardly can be said that rent is an element of damages in the circumstances here presented, and, even if it were, the record does not justify the conclusion that appellee's new quarters in the Combs Hotel, for which he paid rent, were ready for occupancy before the arrival of the equipment.  In addition to this, it must not be overlooked that the goods were ordered on April 19, and delivered on May 23, and there is no showing whatever that the delay was unreasonable.

It follows, from what has been said, that the chancellor should have dismissed the counterclaim, and have rendered judgment in favor of appellant for the amount claimed in the petition.

Judgment reversed, and cause remanded, with directions to enter judgment in conformity with this opinion.